UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | CASE NO. |
| **TERRY RAY ELLIS** | **06-11023** |
| **YVETTE ESPARZA ELLIS** | SECTION A |
| DEBTORS | CHAPTER 7 |
| **JERRY NEIL, SR.** | ADVERSARY NO. |
| **TAMMY NEIL** | **06-1314** |
| PLAINTIFFS | |
| VERSUS | |
| **TERRY RAY ELLIS** | |
| **YVETTE ESPARZA ELLIS** | |
| DEFENDANTS | |

**MEMORANDUM OPINION**

Debtors, Terry and Yvette Ellis ("Debtors"), operated an unincorporated construction business known as All Around Construction ("AAC"). Although Terry Ellis had worked in the construction field for many years, neither ACC nor Debtor was licensed or registered to perform home improvement work by the State of Louisiana. Debtors carried no liability insurance on their activities. The Neils signed a contract with Debtors d/b/a AAC ("Contract").[1] This adversary arises out of that Contract.

The Neils allege that Debtors' work was below professional standards. As a result, substantial damage was sustained. When the Neils tried to make a claim for damages, they discovered that Debtors' were neither licensed nor insured. They also determined that Debtors' had no experience in the elevation of houses. The Neils instituted this adversary proceeding alleging

---

[1] Exhibit 1.

that Debtors misrepresented their skill and experience, misrepresented that they were licensed, and misrepresented that they were insured in an effort to induce the Neils into the Contract. They claim that these misrepresentations were the proximate cause of their loss, and therefore, their claims are nondischargeable.

Debtors dispute that they made any false representations to the Neils. Specifically, Debtors aver that they never represented they were insured nor did they represent that they were experienced in house elevations. They also allege that the home slipped as a result of a failed chain hoist and that the damages sustained were not proximate to any alleged false representations. Under the terms of the Contract, Debtors allege that they are not responsible for the damages sustained.

**I. Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334 and 11 U.S.C. § 523.

**II. Facts**

During Hurricane Rita in September 2005, the Neils' home flooded and sustained substantial damage. Their losses were covered by flood insurance, and they received an ICC grant of $30,000 for the purpose of elevating their home. In March 2006, the Neils began searching for contractors to lift their home. After seeing an ad in the Houma newspaper for AAC, Mrs. Neil contacted Mr. Ellis for an estimate. When Mr. Ellis arrived at Mrs. Neil's home, he represented that he could elevate her house "cheaper and quicker" than other competitors. When questioned about his experience, he represented that he had done this type of work before, was licensed and insured.

On or about March 20, 2006, the Neils entered into the Contract with Terry Ellis d/b/a AAC. The Contract required AAC to raise the Neils' home eight feet; raise and extend a porch; add two four foot landings; pour concrete under the home; fix a hole in the floor; build a bookshelf; and

provide interior trim for a refrigerator.[2] The total amount of the contract was $40,750.00, half of which ($20,375.00) was paid by the Neils before work began.[3]

On April 6, 2006, while Mr. Ellis was raising the Neils' home, the house fell causing the following damage: blocks put under the house by Mr. Ellis went through the back porch floor and also damaged the side wall of the back porch; the toilet, vanity and sink in the bathroom were broken; the bathtub was pushed up; the bathroom floor was damaged; the floor where the kitchen and dining room met was pushed up; the hot water heater fell off its pedestal causing the gas and water lines to it to break; blocks went through the floor in a bedroom; part of the bedroom closet was damaged; some wall paneling was bowed and broken; the exterior doors would not close properly; some kitchen cabinets would not close properly; some windows were broken; and the roof leaked in five places.[4]

Mr. Ellis admitted at trial that he had never elevated a home prior to entering into this Contract. He also admitted that he was not a licensed contractor but only held an occupational license. Mr. Ellis admitted at trial that he represented to the Neils that he was "licensed" in Louisiana, ,admitted that an occupational license was not the equivalent to a contractors license, and admitted that at the time he told the Neils that he was licensed, he knew the difference.

At the time they signed the Contract, the Neils requested proof of insurance, but Mr. Ellis said that he did not have a copy of his insurance declarations page. Over the following few days, the Neils continued to request proof of insurance coverage from Mr. Ellis. On April 2, 2006, Mr. Ellis

---

[2] Exhibit 1.

[3] Exhibit 5.

[4] Exhibit 22.

supplied a certificate of insurance ("Certificate")[5] which allegedly reflected coverage in favor of AAC. The Certificate indicated that Troy Chestnut & Associates, Inc. of Odessa, Texas ("Chestnut") was the producer or agent for the policy and Admiral Insurance Co., Allstate Insurance and Texas Mutual Insurance Co. the insurers. The Neils testified that the existence of insurance was an important factor in the retention of AAC and Debtors.

While Debtors do not deny that they did not have insurance, they claim that they never delivered the Certificate to the Neils and never represented that they were insured. They further allege that the Contract does not require them to carry insurance. Debtors insinuate that the Certificate is a fabrication of the Neils. This is the only explanation for the Certificate's existence in their opinion.

Debtors moved to Louisiana in January 2006 following hurricanes Rita and Katrina. Prior to moving to Louisiana, Debtors resided in Monahans, Texas, a small town near Odessa. Prior to moving to Louisiana, Debtors operated AAC as a construction business. It was there that Debtors had occasion to come into contact with Chestnut. Chestnut was the insurance agent for a subcontractor employed by Debtors while in Texas. As part of that job, Debtors requested a certificate of insurance from Chestnut establishing that the subcontractor held coverage. This was faxed by Chestnut to Debtors. Debtors admitted that they were familiar with certificates similar to the one in question and that their business files contained such certificates.

The Neils are a couple of limited education. However, they were knowledgeable enough in matters of construction to request proof of insurance. They testified that when they received the Certificate, they assumed it was valid. Neither Mr. nor Mrs. Neil had ever heard of Chestnut prior

---

[5] Exhibit 2.

4

to receiving the Certificate. It is also unlikely that even if the Neils were given to fabricating a certificate of insurance, they would have selected Chestnut as the issuing agent. Also, with the exception of Allstate, the carriers provided on the Certificate were not insurers well known to the general public. Thus, the Court finds it incredible that the Neils would have selected an Odessa insurance agent, Admiral or Texas Mutual Insurance companies for a fabricated certificate.

The Court finds one other fact persuasive on this point. Following the damage to her home, Mrs. Neil contacted Chestnut in order to make a claim. She was informed by Chestnut that although they were familiar with AAC, neither the Debtors nor AAC were clients of the agency, and no insurance existed for the job. Following this conversation, Mrs. Neil went to AAC's website, the address for which was provided to her by Mr. Ellis on his business card. The website contained both AAC's former Texas address and present Louisiana location, including Debtors' home and cell phone numbers.[6] The website stated that AAC was "fully insured." Debtors admit that they do not now, nor have they ever had, insurance for their business activities, yet Debtors blatantly declared otherwise on their website. This lends independent credibility to the Neils' allegations that Debtors not only told them they were insured, but produced the Certificate.

The Court finds that Mr. Ellis produced the Certificate and delivered it to the Neils in order to satisfy their request for proof of insurance, representing to them that insurance existed for AAC's business activities. The Court also finds that the existence of insurance was a material factor in the selection of AAC to perform the work.

---

[6] Exhibit 4.

5

Following the events of April 6, 2006, the Neils had an experienced elevation contractor successfully lift their home. The cost of this work was $13,900.00.[7] As a result of the house falling during the prior attempt at elevation, the Neils incurred damages in the form of additional remedial work on their home. The damages included, $3,062.32 in corrective plumbing,[8] $2,234.36 for materials,[9] $2,075.35 in carpentry repairs,[10] and $3,800.00 in electrical work.[11] Mrs. Neil also estimated that the remaining damages would cost an additional $1,500.00.

**II. Law and Analysis**

The Neils allege that Debtors made several material misrepresentations to induce them to enter into the Contract. As a result of those misrepresentations, the Neils aver that they agreed to allow Debtors to perform work on their home for which Debtors were not qualified or insured. The Neils also allege that the damages sustained as a result of Debtors' actions were a proximate result of their inexperience and their failure to maintain insurance. Therefore, the Neils claim that the amounts owed to them are non-dischargeable under section 523(a)(2)(A).

Section 523(a)(2)(A), excepts from discharge money, an extension, renewal or refinancing of credit to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."

---

[7] Exhibits 6 and 9.

[8] Exhibits 8, 10 and 11.

[9] Exhibit 19.

[10] Exhibits 7, 12, 17 and 18.

[11] Exhibits 13, 14, 15 and 16.

False pretenses, representations or actual fraud have been defined as common law terms of art. The United States Supreme Court has determined that Congress meant to incorporate the established meaning of these terms which "[T]hen, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976),..."[12]

Thus, section 523(a)(2)(A) incorporates the general common law of torts, the dominant consensus of common-law jurisdictions rather than the law of any particular State.[13] The Restatement (Second) of Torts[14] defines a fraudulent misrepresentation as a deceit. When one makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action, a deceit has occurred. The perpetrator is liable to the other for pecuniary losses caused as a result of justifiable reliance upon the misrepresentation.[15] The Restatement does not distinguish between false pretenses, representations, or actual fraud. Instead, all are included in the general definition of a fraudulent misrepresentation.

In order for a creditor to prevail under § 523(a)(2)(A), he must prove by a preponderance of the evidence[16] each of the following elements:

(1) that the debtor made a representation;

---

[12] *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995)(citations omitted).

[13] *See, Field v. Mans*, 513 U.S. 59, 71, 116 S.Ct. 437, 444 n.9.

[14] (1976), hereinafter "Restatement."

[15] Restatement § 525.

[16] Preponderance of the evidence has been defined as "the greater weight of evidence. It is th evidence which, when weighed with that opposed to it, has more convincing force and is probably more true and accurate." *Smith v. U.S.*, 726 F.2d 428, 430 (8th Cir. 1984). *See also Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)(establishing preponderance of the evidence burden for objection to discharge).

(2) that the debtor knew the representation was false;

(3) that the representation was made with the intent to deceive the creditor;

(4) that the creditor actually and justifiably relied on the representation; and

(5) that the creditor sustained a loss as a proximate result of its reliance.[17]

Mr. Ellis represented that ACC was licensed, insured and experienced in the elevation of homes. In fact, Mr. Ellis admitted ACC was never licensed, insured nor had any experience in the elevation of homes. The misrepresentations of Mr. Ellis were false and made with an intent to deceive the Neils into entering into the Contract. The Neils were entitled to rely on these representations. The Neils had no duty to investigate the truth of the assertions made, and nothing alerted them to Mr. Ellis' deceit.[18]

"Professional licenses carry with them a degree of presumed competence."[19] Mr. Ellis' claim to be licensed and experienced misled the Neils into assuming they were qualified to perform the Contract. Mr. Ellis' representations as to insurance also induced a false sense of security. The Neils wrongfully believed that should the project run into difficulty as a result of Debtors' negligence, insurance would be available to cover the damage.

Mr. Ellis performed the Contract in an unworkmanlike manner. The fact that Mr. Ellis had never elevated a home, had never been trained or instructed in the proper methods of elevation, and

---

[17] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

[18] Mrs. Neil has only a high school education. Mr. Neil is illiterate.

[19] *McCain v. Fuselier (In re Fuselier)*, 211 B.R. 540, 545 (Bankr.W.D.La. 1997).

8

was not licensed to perform this type of work supports this conclusion. The falling of the house is *res ipsa loquitor.*[20]

### III. Conclusion

The Neils have met their burden of proof by establishing that Mr. Ellis made misrepresentations that he was licensed, insured and experienced in the elevation of homes. At the time Mr. Ellis made the representations, he knew them to be false, and he knew the Neils would rely upon his statements in selecting AAC for the Contract. The Neils were justified in relying on Mr. Ellis' statements, and the damages they sustained were a proximate loss of the misrepresentations. The Neils have proven damages of $26,572.03[21] which are non-dischargeable.

The Neils, however, have not met their burden of proof as to Mrs. Ellis. While Mrs. Ellis did work in AAC's office, the Neils testified that she was not present when Mr. Ellis represented that

he was licensed, insured and had experience raising houses.[22] Therefore, the claims against Mrs. Ellis are dismissed.

New Orleans, Louisiana, August 28, 2007.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[20] The thing speaks for itself. There is a rebuttable presumption that Debtors were negligent in the method they utilized to elevate the Neils residence because the elevation work was entirely within Debtors' control, and the accident was one that does not ordinarily happen in the absence of negligence. Debtors offered no evidence that they performed the Contract in a non-negligent manner and that the falling of the house was due to factors beyond their control.

[21] The Neils paid $13,900.00 to have their home raised correctly. They also spent $11,172.03 repairing damages caused by their home falling. Additionally, Mrs. Neil testified that they will spend another $1,500.00 making repairs.

[22] Mrs. Ellis testified that she was waiting in the car.